IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

GARY GOODMAN                                                                PLAINTIFF

v.                          NO. 5:11CV00022 HDY

MICHAEL J. ASTRUE,                                                          DEFENDANT
Commissioner of the Social
Security Administration

MEMORANDUM OPINION AND ORDER

BACKGROUND. The Commissioner of the Social Security Administration ("Commissioner") has offered an overview of the prior proceedings in this case, the majority of which the Court adopts and is as follows:

> On October 11, 2001, Plaintiff protectively filed his applications for disability insurance benefits and supplemental security income, alleging disability since July 30, 1999, due to emphysema, asthma, and an inability to read ... However, [he] amended his alleged onset date to September 23, 2001 ...[Footnote omitted]. On April 23, 2003, an ALJ issued an administrative decision and denied Plaintiff's applications ... After [he] filed a request for review of the ALJ's decision, the Appeals Council remanded the case for another administrative hearing and decision on June 12, 2003 ... While this case was pending at the Appeals Council, Plaintiff violated his parole and he was imprisoned from mid-2003 through mid-2005 ... This delayed a subsequent hearing and scheduling of a consultative mental examination ... On August 30, 2007, an ALJ issued a partially favorable administrative decision, finding Plaintiff disabled as of October 15, 2006 ... [Footnote omitted]. Specifically, the ALJ determined that Plaintiff's medical condition met Listing 12.05C as of October 15, 2006, due to mental retardation and an acute myocardial infarction ...

> Following this determination, Plaintiff requested review of the ALJ's decision, and the Appeals Council denied such review on October 23, 2008 … [He] appealed his case to the United States District Court for the Eastern District of Arkansas, and the Court remanded the case because the ALJ only noted Plaintiff's 2001 full-scale IQ score of 58 without commenting or explaining whether this IQ score satisfied the requirements of Listing 12.05B … Upon remand, a third ALJ issued a partially favorable decision on October 5, 2010, finding that Plaintiff met Listing 12.05C as of October 15, 2006, due to mild mental retardation and coronary artery disease with myocardial infarction and stent placement … However, the ALJ found that Plaintiff was not disabled prior to October 15, 2006 … On May 16, 2011, the Appeals Council explained that the ALJ's October 2010 decision was the final decision of the Commissioner … Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. 405(g).

See Document 31 at 1-3.

THE JANUARY 21, 2010, REMAND ORDER. In order to properly frame the issues at bar, the Court makes more specific mention of the reason for remanding this case on January 21, 2010. In that order, the Court found the following:

> Plaintiff argues that he met Listing 12.05B and met Listing 12.05C before October of 2006. [Footnote omitted]. …
>
> The ALJ found that the first prong of 12.05C was satisfied by Plaintiff's scores on a Wechsler Adult Intelligence Scale-3d edition (WAIS-III) administered in December, 2005, by Paul L. Deyoub, Ph.D. [Footnote omitted]. … Plaintiff scored a verbal IQ of 63, performance IQ of 70 and full-scale IQ of 63. … The ALJ found the second prong of 12.05C was met in October, 2006, when Plaintiff received a stent after an acute myocardial infarction and was also treated for new onset diabetes mellitus. …
>
> Plaintiff argues that his 2001 score on the WAIS-III met the criteria of 12.05B with a full scale IQ of 58. [Footnote omitted]. The ALJ noted those test results:
>
>> The medical evidence of record reveals the claimant was seen

> for psychological testing in November 2001. At that time the … (WAIS-III) was administered. Test results revealed he was functioning in the mildly mental retarded range of intellectual functioning. [Footnote omitted]. He obtained a Verbal IQ of 61, Performance IQ of 62 and a Full Scale IQ of 58. It was noted that the claimant was "rather concrete throughout the testing process in his responses to questions asked of him, although he worked quite diligently and completed every subtest required."
>
> … He did not, however, further comment on those test results or explain why he did not consider them valid or satisfying the requirement of 12.05B. Given the potentially pivotal importance of that IQ score, the ALJ committed reversible error in not discussing his consideration of it.
>
> … the ruling of the Commissioner must be reversed and the matter remanded for a reevaluation of Plaintiff's IQ scores and whether they meet the requirements of Listing 12.05B.

See Transcript at 757-759.

<u>THE THIRD ALJ'S FINDINGS</u>. Upon remand, the case was heard by an Administrative Law Judge ("ALJ"). He framed the issue before him in the following manner:

> … the Appeals Council has directed the undersigned to reevaluate the claimant's IQ scores and determine whether they meet the requirements of Listing 12.05B. If it is found that his IQ scores do not meet such listing, the undersigned is to provide a basis for such [a] finding. …

See Transcript at 726. The ALJ then made findings pursuant to the five step sequential evaluation process. At step one, he found that plaintiff Gary Goodman ("Goodman") has not engaged in substantial gainful activity since his amended alleged onset date. At step two, the ALJ found the following:

> Since [the claimant's] amended alleged onset date of disability, December 23, 2001 through October 14, 2006, [he] had the following severe impairment: mild mental retardation. Beginning on the established onset date of disability, October 15, 2006, [he] has had the following severe impairments: mild mental retardation and coronary artery disease status-post myocardial infarction with stent placement. ...

See Transcript at 728. At step three, the ALJ found that prior to October 15, 2006, the date Goodman became disabled, he did not have an impairment or combination of impairments listed in, or equal to one listed in, the governing regulations. In making that finding, the ALJ considered the evidence pertaining to Listing 12.05 and found that Goodman did not meet or medically equal the Listing prior to October 15, 2006; specifically, the ALJ found the following:

> The claimant is functionally illiterate in that he cannot read or write. Although no objective evidence (i.e., school report cards) as available, he repeated three grades. He allegedly dropped out halfway through the ninth grade at age 16 in order to work and help support his family after his father's death. ... An IQ test conducted in November 2001 by his treating physician resulted in a full scale IQ score of 58. ... Subsequent testing conducted December 1, 2005 revealed a full scale of IQ score of 63. ... Both scores place the claimant in the mild range of mental retardation; however, there was objective evidence of exaggeration and/or malingering on the December 2005 examination. Despite his low level of intelligence, the claimant worked as a farm hand for over 23 years and continued to seek work upon his release from prison. ... He has a driver's license, drives and can take care of his personal needs without assistance.
>
> During testing, Dr. Stafford noted that the claimant worked in a rather stilted and impulsive manner and failed to complete two of the designs. Despite his low level of intelligence, Dr. Stafford opined that [the clamant's] adaptive functioning was intact was evidenced by the fact that he was able to work and can take care of his activities of daily living quite satisfactorily. ...

> In addition to the objective intelligence testing, Dr. Paul DeYoub performed a Computerized Assessment of Response Bias ("CARB") evaluation. The CARB tests the person's efforts, not his abilities. The claimant scored 56 which evidences very poor effort. His score was lower than that expected from a person with verified brain damage. Dr. DeYoub stated that it is extremely unlikely that even a person with major cognitive deficits would perform as poorly. [The claimant's] score shows that he exaggerated, simulated and malingered his cognitive deficits. The MMPI-2 indicated a "fake bad" profile by amplifying his symptoms and overstating his problems. The MCMI-III provided an invalid profile secondary to his effort to overstate his symptoms. The BDI-II score was 47 which represents an attempt to appear extremely depressed, sad, suicidal and a total failure. The BAI score of 28 is indicative of mild symptoms of anxiety. Of the available 208 problems on the problem list, the claimant checked almost all of them. Dr. DeYoub testified that both examiner's IQ scores are consistent. When asked why the second IQ score was higher, Dr. DeYoub responded that he did not know but can only assume that the claimant put forth more effort on the second examination. Nevertheless, he testified that being illiterate with a lower level of intelligence does not mean the claimant has no adaptive ability. His statement is also consistent with Dr. Stafford's opinion. …

See Transcript at 729-730. The ALJ then assessed Goodman's residual functional capacity as it existed prior to October 15, 2006, the date Goodman became disabled. The ALJ found that prior to that date, Goodman had the residual functional capacity to perform a full range of work at all exertional levels. In making that finding, the ALJ again considered Goodman's scores on his IQ testing and found as follows:

> … the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible prior to October 15, 2006, to the extent they are inconsistent with the residual functional capacity assessment and not supported by the available evidence fo reasons set forth below.

> … counsel for claimant argues that under <u>Muncy v. Apfel</u> … and <u>Contreras v. Asture</u> …, the undersigned must rely on the earlier full-scale IQ score and must find that the claimant meets the requirements of Listing 12.05B. … The undersigned disagrees. … Dr. Stafford noted twice that the claimant completed the first examination in an impulsive manner; however, he failed to assess the claimant's efforts. Dr. DeYoub, on the other hand, performed a more thorough examination as he assessed the claimant's efforts and found that he was exaggerating and malingering. … The undersigned notes that although functionally illiterate, the claimant began driving a tractor at age 12 and successfully worked unskilled and semi-skilled jobs for 23 years. He only stopped working in 1999 because he was arrested. The claimant has a valid driver's license and is independent in his activities of daily living. The claimant scored within the mild range of mental retardation; however, both examiners agreed that his adaptive functioning was fine.
>
> … Although both [Dr. Stafford and Dr. DeYoub] agree the claimant is mildly mentally retarded and functionally illiterate, the most recent evaluation is felt to be a more reliable evaluation due to the thoroughness of the evaluation and the administration of the CARB. When an examiner wants to make an accurate diagnosis concerning exaggeration and malingering, it is customary to do objective testing such as an MMPI and CARB which would objectively assess for malingering and exaggeration. The CARB test is recognized as the standard for assessment of malingering and oppositional responding. Dr. Stafford performed neither test whereas Dr. DeYoub conducted both.

<u>See</u> Transcript at 734-735. At step four, the ALJ found that prior to October 15, 2006, the date Goodman became disabled, he was capable of performing his past relevant work as a farm laborer. The ALJ found that after October 15, 2006, Goodman was incapable of performing not only his past relevant work but all work as his impairment met Listing 12.05C. Accordingly, the ALJ concluded that Goodman was not disabled at any time prior to October 15, 2006, but became disabled on that date and continued to be disabled through the date of the ALJ's decision.

STANDARD OF REVIEW. The sole inquiry for the Court is to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole. It requires the Court to consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary. See Heino v. Astrue, 578 F.3d 873 (8th Cir. 2009).

GOODMAN'S ASSERTIONS OF ERROR. Are the ALJ's findings supported by substantial evidence on the record as a whole? Goodman thinks not and offers the following two reasons why: 1) given his full scale IQ of 58, his mental impairment met and/or equaled Listing 12.05B at step three; and 2) the impairment also met or equaled Listing 12.05C at step three.

THE RELEVANT PERIOD. The Court begins by noting that the relevant period in the case at bar is the period prior to October 15, 2006. The ALJ has awarded benefits to Goodman for the period after that date.

LISTING 12.05B. Goodman first maintains that his mental impairment met and/or equaled Listing 12.05B at step three. He maintains that he had significant sub-average general intellectual functioning with deficits in adaptive functioning and a valid full scale IQ of 59.

At step three, the ALJ must determine whether a claimant's impairments, when considered individually and in combination, meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). In order to meet a listed impairment, the claimant's impairment must "meet all of the specified medical criteria." See Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995) [emphasis in original] [quoting Sullivan v.

Zebley, 493 U.S. 521, 530 (1990)]. In order to equal a listed impairment, the claimant's must "present medical findings equal in severity to <u>all</u> the criteria for the one most similar listed impairment." See Id. [emphasis in original] [quoting Sullivan v. Zebley, 493 U.S. at 531]. The determination at step three is strictly a medical determination. See Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990).

The Commissioner represents, and the Court agrees, that Listing 12.05B requires the claimant to make a two-part showing. First, he must show that he had significantly sub-average general intellectual functioning with deficits in adaptive behavior initially manifested prior to the age of twenty-two. Second, he must show that he had a valid verbal, performance, or full scale IQ of 59 or less.

The ALJ found at step three that Goodman is mildly mental retarded and functionally illiterate. The ALJ nevertheless found that during the period prior to October 15, 2006, Goodman's adaptive functioning was fine and he did not have a valid verbal, performance, or full scale IQ of 59 or less. The ALJ thus found that Goodman's impairment neither met nor equaled Listing 12.05B during the relevant period.

Substantial evidence on the record as a whole supports the ALJ's finding that Goodman's impairment neither met nor equaled Listing 12.05B during the period prior to October 15, 2006. The ALJ re-evaluated Goodman's IQ scores as the Court directed in the January 21, 2010, remand order, and the ALJ could and did properly find upon remand that Goodman did not have a valid verbal, performance, or full scale IQ of 59 or less during the relevant period.

The record reflects that in October of 2001, Goodman began seeing the medical professionals at the Southeast Arkansas Behavioral Clinic ("Behavioral Clinic"). He reported doing so only at the insistence of his parole officer as Goodman did not see himself as having any particular difficulties. See Transcript at 164.

On November 7, 2001, a psychologist at the Behavioral Clinic, Dr. Ed Stafford ("Stafford"), Ph.D., saw Goodman for "psychological testing due to concerns regarding his cognitive functioning and overall intellectual functioning." See Transcript at 156. One of the tests administered by Stafford was a Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III), after which he made the following findings:

> BEHAVIORAL OBSERVATIONS: Mr. Goodman presented as a cooperative, but mostly serious, 41 year old, white male who was unclear as to exactly why he needed to have his intellectual functioning assessed, other than he is in the process of dealing with his disability benefits. He was very cooperative and worked quite diligently and quickly, if not impulsively, throughout the evaluation process.
>
> …
>
> SUMMARY AND RECOMMENDATION: Results of cognitive testing indicated Mr. Goodman is currently functioning clearly in the Mildly Mentally Retarded range of intellectual functioning. He obtained a WAIS-III Full Scale IQ score of 58 … Thus, Mr. Goodman's cognitive functioning is quite poor, although he seems to have some adaptive abilities as he is obviously able to take care of his activities of daily living satisfactorily. However, Mr. Goodman noted he was fired from a job as he recently burned up 65 acres of cotton due to his inability to correctly read the labels on the pesticides on the farm on which he was working. Thus, it may be advisable for [his] adaptive capacities to be measured and evaluated in the near future.

See Transcript at 156-157.

On December 1, 2005, a second psychologist, Paul DeYoub ("DeYoub"), Ph.D., saw Goodman for an evaluation in connection with his claim for social security benefits. DeYoub administered a WAIS-III as well as a Computerized Assessment of Response Bias ("CARB"). He found Goodman's verbal IQ and full scale IQ to be 63 and his performance IQ to be 70. See Transcript at 352. As to the CARB, DeYoub found the following:

> He had a CARB total percent correct score of 56 indicating very poor performance. This means poor effort because this is a test of effort, not ability. His poor performance was in the range of persons making minimal effort and not attending to the task, responding randomly. This is far below that expected from either normal controls or persons with verified brain damage. Persons with his IQ, as well as normal IQ's, do very well on this test because it does not involve ability only effort and attention. It is extremely unlikely that even a person with major cognitive deficits would perform this poorly. This means he tends to exaggerate, simulate, and malinger cognitive deficits, even if he is actually low functioning. He could be low functioning and at the same time exhibit little effort. Litigation and secondary gain is likely with a CARB like this. ...

See Transcript at 352-353. DeYoub's conclusions were as follows:

> Mr. Goodman can understand, remember, and carry out simple instructions. His adaptive ability is consistent with mental retardation given a history of social maladjustment, academic deficits, and work maladjustment. His able to handle his own benefits ... He tends to amplify symptoms and there is some degree of malingering even though this does not erase his low level of functioning. It is clear that he is intent on receiving disability, states that he cannot work because of his many problems and his educational limitations, and the test results indicate that he is low functioning, but that he does not have any serious psychiatric disorder. ...

See Transcript at 354.

As the foregoing demonstrates, Stafford and DeYoub agreed that Goodman was mildly mentally retarded and functionally illiterate prior to October 15, 2006. Stafford and DeYoub disagreed, however, as to Goodman's IQ; Stafford placed it at 58 and DeYoub placed it at 63. The ALJ credited DeYoub's evaluation, finding it to be a more reliable evaluation due to "the thoroughness of the evaluation and the administration of the CARB." See Transcript at 735. Because it is the ALJ's function to resolve conflicts in the medical evidence, see Bentley v. Shalala, 52 F.3d 784 (8th Cir. 1995), and the ALJ in this instance provided reasons for resolving the conflict between Stafford and DeYoub's evaluations, the ALJ did not err in choosing to credit DeYoub's evaluation. The ALJ could and did properly find upon remand that Goodman did not have a valid verbal, performance, or full scale IQ of 59 or less prior to October 15, 2006 and, as a result, his impairment did not meet nor equal Listing 12.05B during the relevant period.

LISTING 12.05C. Goodman alternatively maintains that his mental impairment met and/or equaled Listing 12.05C at step three. He appears to so maintain because he is functionally illiterate and was diagnosed by several medical professionals with an anti-social personality disorder and an adjustment disorder with depressed mood during the period prior to October 15, 2006.

The Commissioner represents, and the Court agrees, that Listing 12.05C requires the claimant to make a multi-part showing. One component of the showing requires him to show the existence of an additional impairment that imposed significant work-related limitations of function.

The ALJ found at step three that during the period prior to October 15, 2006, Goodman did not have an impairment apart from functional illiteracy that imposed significant work-related limitations of function. See Transcript at 737.[1] The ALJ offered the following support for the foregoing finding:

> … the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible prior to October 15, 2006, to the extent they are inconsistent with the residual functional capacity assessment and not supported by the available evidence fo reasons set forth below.
>
> …
>
> … there is no evidence of any health care provider restricting the claimant from any work activity. Not one of his physicians opined that the claimant is disabled because of his alleged impairments. Also, seeking work while applying for benefits are activities inconsistent with complaints of disability. … The claimant told his therapist that he was able to occasionally pick up odd jobs but he had not found continuous work and felt that he could be doing more. … The claimant also reported that no one would hire him on a regular basis but there was a possibility of getting a job at the first of the year. He found a job but allegedly was fired because his employer found out about his sexual abuse charge. …
>
> … if an impairment can be controlled by treatment or medication, it cannot be considered disabling. … The claimant received mental health treatment for depression upon his release from prison on at least two occasions. He received medication to help him sleep and individual therapy which brought relatively quick results. … His impairments do not more than minimally affect his ability to carry on basis work activity.

---

[1] The Commissioner maintains, and the Court agrees, that illiteracy is not a separate medically determinable impairment that causes significant work-related limitations of function.

> Finally, the claimant acknowledged being able to perform a wide range of daily activities, including the ability to: fish, hunt, drive, tinker with mechanics, wash dishes, change sheets, prepare meals, work odd jobs, go scrapping, count change, attend church, watch television, visit with friends and relative and commit crimes. ... While incarcerated the claimant unloaded trucks, worked in the kitchen four hours daily and attended classes two and one-half hours daily. ... The performance of these activities is inconsistent with a finding of disabled.

See Transcript at 735-736.

Substantial evidence on the record as a whole supports the ALJ's finding that Goodman's mental impairment neither met nor equaled Listing 12.05C during the period prior to October 15, 2006. The ALJ could and did properly find that Goodman did not have an impairment apart from functional illiteracy that imposed significant work-related limitations of function.

The record reflects that in October of 2001, a medical professional at the Behavioral Clinic diagnosed Goodman with an anti-social personality disorder and an adjustment disorder with depressed mood. See Transcript at 164. There is no evidence, however, that the medical professional imposed any work-related limitations on Goodman as a result of the impairment. The only work-related notation of any kind contained in the medical professional's report is as follows: "Mr. Goodman states that he last worked in 1999, when he drove a tractor on a farm. He says he worked there for about eight years, stopped working when he was arrested. He states that he has now applied for disability and medicaid." See Transcript at 163.

DeYoub also diagnosed Goodman with an adjustment disorder, specifically, an adjustment disorder with "mixed anxiety and depressed mood." <u>See</u> Transcript at 354. There is no evidence, however, that DeYoub imposed any work-related limitations on Goodman as a result of the impairment. The only work-related notation of any kind contained in DeYoub's reports indicates that although Goodman had previously worked as a farmhand, he had problems doing so because of his inability to read, not because of some limitation caused by his adjustment disorder. <u>See</u> Transcript at 350.

In addition to the lack of any work-related limitations being imposed on Goodman, the record indicates that he was able to work for a number of years, <u>see</u> Transcript at 99, and only stopped working when he was incarcerated, <u>see</u> Transcript at 163. The record indicates that after he was released on parole, he acquired "odd jobs here and there." <u>See</u> Transcript at 224. He also told a medical professional at the Behavioral Clinic that "he is still waiting on his disability, however, if it does not come within a couple of months, he ... is just going to have to go out and find some type of work as he needs money to survive." <u>See</u> Transcript at 224. The record additionally indicates that Goodman's impairment was amendable to treatment when he was compliant with his medication. <u>See</u> Transcript at 225-226, 371, 375-376, 400-401. Last, although not to be accorded controlling weight but only some weight, the findings of two state agency physicians reflect that Goodman's adjustment disorder did not meet Listing 12.05C. <u>See</u> Transcript at 170-188, 192-208.

In short, the record contains no evidence of any work-related limitations being imposed on Goodman as a result of his adjustment disorder. In fact, the record indicates that he was capable of working despite having the impairment. The impairment is not the "additional impairment that imposed significant work-related limitations of function" and, as a result, his impairment did not meet or equal Listing 12.05C during the relevant period.

<u>CONCLUSION</u>. There is substantial evidence on the record as a whole to support the ALJ's findings. Accordingly, Goodman's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this ___23___ day of April, 2012.

_____
UNITED STATES MAGISTRATE JUDGE